IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
Civil Action No.: 3:21-cv-500

| | |
|---|---|
| R. MATTHEW DILLARD,<br><br>        Plaintiff,<br><br>    v.<br><br>STARPOWER, INC., STAR DANCE ALLIANCE, LLC, CAREFIRST BLUECHOICE, INC., CAREFIRST OF MARYLAND, INC., GARY D. PATE AND MARK A. BARONDESS,<br><br>        Defendants. | **COMPLAINT**<br>**(Jury Trial Demanded)** |

## NATURE OF THE ACTION

1.      This is an action by Plaintiff R. Matthew Dillard ("Plaintiff" or "Dillard") under Title I of the Americans with Disabilities Act (ADA) of 1990, as amended, (42 U.S.C. § 12101, *et. seq*.) and under the North Carolina Persons with Disabilities Protection Act (N.C. Gen. Stat. § 168A-1, *et. seq*.) to redress disability discrimination and retaliation and correct unlawful employment practices, to include wrongful discharge, by Defendants Starpower, Inc., Star Dance Alliance, LLC, Gary D. Pate, and Mark A. Barondess (collectively "Defendants") against Dillard because of his disability and his resistance to unlawful discrimination.

2.      All references to the ADA in this Complaint shall be understood to also refer to all State law claims arising under Chapter 168A of the North Carolina General Statutes.

3.      This is also an action under the Family and Medical Leave Act (FMLA), 29 U.S.C.A. §§ 2601, *et. seq*., to redress willful acts of interference with FMLA rights, and also to redress willful acts of discrimination and retaliation by Defendant based on Dillard's need for, and receipt of, FMLA.

4.     This is also an action under the Consolidated Omnibus Budget Reconciliation Act, 11 U.S.C. § 1161, *et. seq*. (COBRA) and the Employee Retirement Income Security Act of 1974 (ERISA).

5.     This is also an action under state law alleging that Defendants were negligent in not providing workers' compensation insurance and not adopting and requiring work place practices and policies that would have prevented Dillard's back injury on at least two occasions, one while at his home office, during working hours, and one while at a work event.

6.     This is also an action under state law against the Defendants on behalf of the Dillard for wrongfully discharging Dillard in violation of public policy as a result of his resistance and opposition to Defendants' actions, including the above violations of both the FMLA and the ADA and also for complaining that Defendants failed to carry workers' compensation insurance which would have provided him with leave and covered his medical payments for his workplace injuries.

## PARTIES, JURISDICTION AND VENUE

7.     Plaintiff Dillard is a citizen and resident of Union County, Monroe, North Carolina, and was employed by one or more Defendants at all times relevant to this Complaint.

8.     Defendant Starpower, Inc. ("Starpower") is a corporation existing under the laws of the State of Maryland with its primary place of business located at 163 Mitchells Chance Road, Suite 225, Edgewater, Maryland, 21037; a corporate office located at 2170 Old Washington Road, Suite 107, Waldorf, Maryland 20601; and with a registered agent of Mark A. Barondess and registered address of 1695 Epping Farms Lane, Annapolis, Maryland, 21401.

9.     At all times relevant to this Complaint, Starpower has been an employer under 29 U.S.C.A. § 2611(4), 42 U.S.C. §§ 12111(2), 12111(5), and N.C. Gen. Stat. § 168A-3.

10.    Defendant Star Dance Alliance, LLC ("Star Dance") is a corporation existing under

2

the laws of the State of Maryland with its primary place of business located at 163 Mitchells Chance Road, Suite 225, Edgewater, Maryland, 21037; a corporate office located at 2170 Old Washington Road, Suite 107, Waldorf, Maryland 20601; and with a registered agent of Mark A. Barondess and registered address of 200 Duke of Gloucester Street, Annapolis, Maryland, 21401.

11.     At all relevant to this Complaint, Star Dance has been an employer under 29 U.S.C.A. § 2611(4), 42 U.S.C. §§ 12111(2), 12111(5), and N.C. Gen. Stat. § 168A-3.

12.     Starpower is a wholly owned subsidiary of Star Dance.

13.     Upon information and belief, Starpower and Star Dance (collectively "Starpower Defendants") operate as a single entity in that they, *inter alia*, have comingled funds, the same or similar officers, managers, and members, use the same or similar office and mailing address, have the same or similar employees, perform the same or similar work, and for all purposes under the laws of North Carolina operate as alter egos of each other so as to pierce the corporate veil and impute all acts and omissions of each entity to the other.

14.     Upon information and belief, Gary D. Pate ("Pate") is an individual citizen and resident of the State of Maryland with a residential address of 237 Edgewater Drive, Annapolis, Maryland 21037.

15.     At all times relevant to this Complaint, Pate was the majority shareholder, director, member, fiduciary, and officer of the Starpower Defendants and was responsible for making business decisions for such Defendants, including financial, hiring, firing, managerial, and employment decisions.

16.     Upon information and belief, Mark A. Barondess ("Barondess") is an individual citizen and resident of the State of Maryland with a residential address of 1695 Epping Farms Lane, Annapolis, Maryland 21401.

3

17.     At all times relevant to this Complaint, Barondess operated as an officer, advisor, fiduciary, and key decisionmaker of the Starpower Defendants and made decisions for such Defendants, including financial, hiring, firing, managerial, and employment decisions.

18.     Defendant CareFirst Bluechoice, Inc. is a corporation existing under the laws of the state of Maryland, with its principal place of business at: 840 First Street, NC Washington, DC 20065; and with a registered agent of The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, MD 21093-2264.

19.     Defendant CareFirst of Maryland, Inc. is a corporation existing under the laws of the state of Maryland, with its principal place of business at: 1501 S. Clinton Street, Baltimore, MD 21224; and with a registered agent of The Corporation Trust, Incorporated, 2405 York Road, Suite 201, Lutherville Timonium, MD 21093-2264.

20.     This Court has jurisdiction over Dillard's ADA, FMLA, and COBRA/ERISA claims under 28 U.S.C. §§ 1331 (federal question) and over Dillard's state law claims (disability discrimination, NC mini-COBRA, breach of contract, tortious interference with contract, and wrongful discharge) under 28 U.S.C. § 1367 (supplemental jurisdiction).

21.     The acts which are the subject of this action and alleged to be unlawful were committed in the Western District of North Carolina in that Dillard was employed and worked from his home office when he was not travelling in the course of his work for Defendants.

22.     All administrative prerequisites have been met as Dillard was issued a right to sue letter by the EEOC dated June 24, 2021, and this Complaint alleging that Defendants violated Dillard's rights to be free from discrimination under the ADA is filed within less than ninety (90) days from that date. *See* **<u>Exhibit 1</u>** – Right to Sue Letter.

4

## STATEMENT OF FACTS

23.     Defendants Starpower and Star Dance are engaged in the business of conducting talent and dance competitions around the world.

24.     Defendants Starpower and Star Dance were founded by Grace Wakefield and Gary Pate. *See* https://starpowertalent.com/aboutus/#founders (last visited 9/21/2021).

25.     Dillard's employment with Defendants Starpower and Star Dance began in 2009.

26.     Plaintiff was the National Director for Defendants, by which he was responsible for overseeing and managing the sale, marketing, booking, staffing, promoting, and running of approximately forty (40) events annually across the United States.

27.     From the beginning of his employment, Dillard, Defendant Pate, and co-founder Grace Wakefield enjoyed an amiable and collegial relationship. This relationship continued until Dillard suffered work related injuries as described in this Complaint.

28.     Dillard and many of Defendants' employees routinely worked more than eighty (80) hour work weeks when they were required to travel to various talent and dance competitions around the country.

29.     Dillard was required to work from his home office when he was not traveling for the Starpower Defendants.

### DILLARD'S WORK INJURIES

30.     On May 14, 2014, Dillard suffered an injury while working in his home office. While sitting at his desk, Plaintiff made a movement and suddenly experienced intense and debilitating back pain rendering him unable to stand. Dillard called to his wife who came into his office and found him lying on the floor unable to move without pain.

31.     Dillard sought medical treatment on June 2, 2014 and was finally seen by an

5

orthopedic practice on June 5, 2014, at which time he was diagnosed with a ruptured several disk, L3, L4, L5 with protrusion into the spine. After several years of Dillard's ruptured disk not healing, Dillard was later diagnosed with damaged nerves and arthritis in his facet joints.

32.    Three months later, in July 2014, while at a dance competition in Myrtle Beach, South Carolina, Dillard bent over to move a trophy on the stage and suffered an additional work injury to his back, rendering him in severe pain and loss of mobility. This injury was witnessed by at least two co-workers Colin Dunn and Lorie Holtey.

33.    These back injuries resulted in Dillard having a disability which caused significant pain and affected his mobility. In addition, the pain associated with the injuries negatively affected Dillard's mental health.

34.    Dillard was prescribed stimulates, opioids, and multiple antidepression medications to enable him to continue working for Defendants.

35.    At the time of these injuries in 2014, the Starpower Defendants told Dillard that the Starpower Defendants had no workers' compensation insurance for Dillard's work injury and that only Defendants' employees located in Maryland and Ohio were covered by workers' compensation insurance.

36.    All Defendants were aware at all times of Dillard's work injuries in 2014.

37.    Virtually all employees of the Starpower Defendants knew of Dillard's work injuries and how they occurred.

38.    Likewise, Defendants and the employees of the Starpower Defendants were aware of the pain medication Dillard had been prescribed to allow him to continue to work at the pace he had previously worked prior to the injury.

39.    Despite his disability and associated pain, Dillard continued to have a high degree

6

of success bringing in hundreds of thousands of dollars of business for Defendants.

40.     Upon information and belief, Defendants knew or should have known that the Starpower Defendants were required under the laws of North Carolina to carry workers' compensation insurance for all North Carolina employees.

41.     Defendants failed and refused to provide Dillard with workers' compensation insurance and failed; failed and refused to allow him to file a workers' compensation claim; provided false and inaccurate information to Dillard relating to Dillard's eligibility for, and the Starpower Defendants' responsibility to provide workers' compensation insurance; and failed and refused to provide Dillard with information required by law relating to his work injuries.

42.     Upon information and belief, Defendants' acts and omissions were intentional, negligent, and in reckless disregard for Dillard's health, disability, and rights under state and federal law.

DILLARD'S EMPLOYMENT AGREEMENT

43.     In April 2015, Defendants offered, and Dillard agreed, to continue working for Defendants as Director of the Believe National Talent Competition pursuant to an Employment Agreement ("Agreement"), dated On April 8, 2015, for an initial term of April 1, 2015 to August 31, 2017, which was subject to automatic renewal each year on August 31. *See* **Exhibit 2** – Dillard Employment Contract, ¶¶ 1-2.

44.     The Agreement provided for an annual base salary of $105,000.00 paid bi-weekly, along with be-weekly draws against net profits up to $20,000.00, and an annual payment of 10% of the net profit on the first $200,000.00 and 15% on all net profit in excess of $200,000.00. *Id.,* ¶ 13(a)-(c).

45.     The Agreement defined "net profit" as "the income calculated by taking all

7

revenues directly and solely associated with or attributable to the operations of [Starpower] and adjusting for the cost of its direct and indirect allocable expenses, depreciation, interest, taxes and other expenses." *Id.,* ¶ 13(d).

46.    The Agreement also provided that it would be calculated by Defendants by February 1 of each calendar year "and a statement reflecting said net profit shall be provided to" Dillard by said date. *Id.,* ¶ 13(e).

47.    The Agreement also provided that Defendants would provide "Fully Paid Group health care and disability benefits . . . ." *Id.,* ¶ 10(c)(i).

48.    Dillard was able to continue his high degree of success for all of the years following his employment contract. Specifically, for the year 2015 on a gross profit of $1.15 million, Dillard's compensation was $145,642.00.

49.    For the year 2016, on a gross profit of $1.8 million, Dillard's compensation was $190,378.00.

50.    For the year 2017, on a gross profit of $2.2 million, Dillard's compensation was $340,552.00.

51.    However, for the year 2018, on a gross profit of $2.19386 million, Dillard's compensation inexplicably dropped to $107,000.00, less than half of his previous year's earnings for a net profit less than the previous years by only $6,140 or a .003% decrease in net profit.

52.    For 2018, Defendants failed to properly calculate and pay the compensation owed Dillard under his contract.

53.    No changes, amendments, or modifications to the Agreement were made by Dillard and the Starpower Defendants between 2017 and 2018 to explain or support the disparity in pay.

54.    For the year 2019, on a gross profit of $2.5 million, the highest gross profit ever,

8

Dillard was compensated only $113,000.00.

55.     For 2019, Defendants again failed to properly calculate and pay the compensation owed Dillard under his contract.

56.     Again, no changes, amendments, or modifications to the Agreement were made by Dillard and the Starpower Defendants between 2017 and 2019 to explain or support the increased disparity in pay.

57.     However, beginning in 2017, Pate and the Starpower Defendants began relying on Barondess in making corporate and executive business decisions.

58.     Defendant Barondess began heavily advising Defendant Pate regarding the corporate and executive decisions of the Starpower Defendants and was also responsible for carrying out the decisions on behalf of Pate and the Starpower Defendants.

59.     In 2017, Pate and Barondess began making changes in the business and financial operations of the Starpower Defendants, including the unilateral, unlawful reduction in Dillard's compensation despite Dillard's strong history of sales and his Agreement with the Starpower Defendants.

60.     Upon information and belief, Barondess persuaded Pate that Dillard was being paid too much pursuant to his Employment Agreement and convinced Pate to reduce the amount of compensation owed to Dillard despite the clear terms of Dillard's Employment Contract.

61.     In addition, upon information and belief, Barondess and Pate looked unfavorably upon Dillard for having a work injury and conspired to force him out of the company.

62.     Upon information and belief, the drastic reduction of Dillard's pay was the direct result of Defendants' discrimination against Dillard for his disability; their attempt to force him out of the company due to his disability; Defendants' retaliation against Dillard due to his disability

9

and attempts to treat for such disability; and their desire to increase the profits of the Starpower Defendants.

63.     In making these changes and reducing Dillard's pay, Pate and Barondess acted with malice aforethought and to the detriment of Dillard with full knowledge of Dillard's contract rights and rights as a person with a disability under state and federal law.

### DILLARD'S CONDITION WORSENS

64.     At all times relevant to this Complaint, Defendants were aware of Dillard's disabilities and serious medical conditions.

65.     Defendants were specifically aware that Dillard suffered a depressive episode in May 2018.

66.     Between February and June of 2019, Dillard became increasingly depressed from the physical pain he was suffering and as a result of a series of personal tragedies.

67.     On or about June 18, 2019, Dillard consulted his physician. At that time, Dillard was diagnosed with sinus tachycardia and was prescribed a second blood pressure medication.

68.     Dillard was also diagnosed with depression and his physician referred him to both a psychiatrist and psychologist.

69.     On June 18, 2019, Dillard's wife called Defendants' Human Resources (HR) Director Christine Schmenk-Woods to let Defendants know of Dillard's health issues and that he would need to take some time off. She also asked Ms. Schmenk-Woods to inform Pate.

70.     Defendants have admitted that HR was notified of Dillard's condition and that he would need time off.

71.     On June 18, 2019, Dillard's wife also called Pate directly and told him that Dillard needed personal time to treat his health issues.

72.     On June 19, 2019, Dillard's wife also called Grace Wakefield, the co-founder of Starpower to inform her of her husband's condition and Grace Wakefield replied, "Let Matt know that he should take his time and feel better soon!"

73.     Between June 19, 2019, and August 17, 2019, Dillard scheduled and attended many appointments with medical providers for physical therapy, recurring back pain, and depression.

**DEFENDANTS' AUGUST 17, 2019 TERMINATION LETTER**

74.     On August 18, 2019, Dillard received a letter in the mail dated August 17, 2019, from Baroness, on his law firm letterhead. The letter made accusations that Dillard had breached his contract, engaged "in a pattern of inattention and neglect" of his contractual duties, and that he had demonstrated a "complete and utter lack of respect for both Gary and me" by his "willful disregard of his contractual duties." *See* **Exhibit 3** – Dillard Termination Letter.

75.     After two pages of accusations, the letter concluded as follows:

> *Accordingly, please accept this letter as your notice of termination from Starpower, Inc., for cause, as the National Director of Believe. If you respond to this letter by the close of business on Monday, August 19, 2019 and offer to resign in lieu of being terminated, I will withdraw this letter of termination upon the receipt of your letter of resignation. This will allow you to avoid having any negative impact on your employment record moving forward.*

76.     Dillard never received any notice of his COBRA rights to continue his health care coverage for himself and his family, but he continued to received health care benefits between October 2019 and March 2020.

77.     Dillard and his family received no notice of his entitlement to COBRA in March 2020 or anytime thereafter.

78.     In addition, at the time Dillard was terminated, Defendants were in breach of the Employment Agreement for his position as Director of the Believe National Talent Competition

due to their failure to provide him with a calculation of net profits on February 1, 2019, for the preceding year and failure to provide compensation under the Agreement.

79. Defendants were aware at the time of his termination that Dillard was suffering from, and getting treatment for, his disabilities which were also serious medical conditions.

80. Defendants were also aware at the time they terminated Dillard that they failed to carry workers' compensation insurance; failed to provide such insurance to Dillard for his work-related injuries; and that Dillard had complained about Defendants' failure to provide him with workers' compensation coverage for his work injuries and for the treatments that he was undergoing even at the time of his termination.

### DEFENDANTS' POST HOC PRETEXTUAL TERMINATION

81. After Dillard challenged his termination, Barondess authored a document in which he alleged on behalf of Defendants that Dillard was terminated for the grounds other than those stated in the August 17, 2019 letter.

82. Specifically, Barondess alleged that Dillard:

> . . . engaged in other inappropriate conduct during the course of his employment, including but not limited to:
>
> A. Inappropriate sexual conduct towards co-workers of the Respondent;
>
> B. Engaging in a romantic and sexual relationship with a customer of the Respondent (the Claimant was, and is still upon information and belief, a married man) endangering the business and goodwill of the Respondent;
>
> C. Failing to perform duties truthfully and honestly as required for the proper conduct of his duties;
>
> D. Failing to adhere to established corporate policies and procedures including, but not limited to, those set forth in the Handbook;

12

*E. Engaging in gross malfeasance in the performance and or omission of his duties; and*

*F. Abusing alcohol on numerous occasions to the extent that it impaired him from complying with his contractual obligations and duties.*

83.     The allegations contained in the preceding paragraph are false and offered as a pretext for Dillard's unlawful termination.

84.     Notably, none of these issues had ever been raised with Dillard prior to his unlawful termination in August 2019.

85.     Dillard was also surprised to see allegations of sexual impropriety on the list of his alleged failings because sexual misconduct and engaging in inappropriate romantic and sexual relationship was a standard practice engaged in by Defendants' employees and owners.

### DILLARD'S WORKERS' COMPENSATION CLAIM

86.     After Dillard was terminated and obtained legal counsel, Dillard filed a workers' compensation claim against the Starpower Defendants with the N.C. Industrial Commission ("Industrial Commission") on April 23, 2021. *See* **Exhibit 4** – Dillard's Workers' Compensation File Documents.

87.     On April 23, 2021, the Industrial Commission informed Defendants of their obligation to file a Form 60, 61, or 63 to admit, deny, or pay without prejudice.

88.     On June 28, 2021, Defendants were sanctioned for their failure to comply with a fine of $400.00 and again ordered Defendants to file a Form 60, 61, or 63 within 30 days of the Order Assessing Sanctions.

89.     On August 2, 2021, Defendants filed a Form 61 denying Dillard's claim.

90.     Dillard is pursuing compensation for his damages due to his workplace injury in the Industrial Commission.

**COUNT ONE**
**DISCRIMINATION IN VIOLATION OF THE ADA**
**42 U.S.C. § 12101, *et. seq***

91.     Plaintiff incorporates the allegations contained in ¶¶ 1–90 as though fully set forth in this paragraph.

92.     Plaintiff was a qualified disabled employee as defined under the ADA.

93.     Defendants were aware that Plaintiff was a qualified disabled employee.

94.     Defendants Starpower and Star Dance are employers as defined under the ADA.

95.     Defendants were aware that Plaintiff was suffering from a disability when they wrote him a letter proposing to terminate his employment if he did not resign.

96.     Defendants failed to engage in the interactive process with Plaintiff to determine if Plaintiff could be provided a reasonable accommodation at the time they terminated him for not performing his duties as alleged in his termination letter.

97.     This termination violated Plaintiff's rights to a reasonable accommodation under the ADA and Plaintiff's rights to be free from discrimination under the ADA.

98.     Plaintiff suffered damages from his discriminatory termination and the failure of Defendants to work with him regarding a reasonable accommodation for his disabilities.

**COUNT TWO**
**RETALIATION IN VIOLATION OF THE ADA**
**42 U.S.C. § 12101, *et. seq***

99.     Plaintiff incorporates the allegations contained in ¶¶ 1–98 as though fully set forth in this paragraph.

100.    The ADA prohibits employers covered thereby from retaliating against an employee for asserting their rights under the ADA for a reasonable accommodation as Plaintiff did in June 2019 when he sought leave from work to deal with his medical conditions which

14

constituted disabilities.

101.　　Defendants retaliated against Plaintiff because he asserted his rights to a reasonable accommodation for his disabilities by discharging Plaintiff.

102.　　Plaintiff suffered damages from his retaliatory termination by Defendants.

## COUNT THREE
### DISCRIMINATION BASED ON DISABILITY AND RETALIATION
### N.C. Gen. Stat., Chapter 168A

103.　　Plaintiff incorporates the allegations contained in ¶¶ 1–102 as though fully set forth in this paragraph.

104.　　Defendants' same actions that violated the anti-discrimination and anti-retaliation provisions of the ADA also violated Chapter 168A of the North Carolina General Statutes.

105.　　As a result of Defendants' actions, Plaintiff has suffered damages and is entitled to all relief available under Chapter 168A.

## COUNT FOUR
### VIOLATION OF THE FMLA (INTERFERENCE)
### 29 U.S.C. § 2601, *et. seq.*

106.　　Plaintiff incorporates the allegations contained in ¶¶ 1–105 as though fully set forth in this paragraph.

107.　　Defendants are employers covered by the FMLA pursuant to 29 U.S.C. § 2601, *et. seq.* because they are a private business that employed fifty or more employees for each working day for at least twenty workweeks in the year prior to Plaintiff's request for leave.

108.　　Plaintiff is an FMLA-eligible employee because he was employed by Defendants for almost ten years prior to requesting FMLA leave and had been employed by Defendant for over 1,250 hours in the twelve-month period prior to his request.

109.　　At the time of his termination, Plaintiff suffered from multiple Serious Health

15

Conditions as defined by the FMLA. Specifically, Plaintiff suffered from episodes of depression and damaged nerves and arthritis in his facet joints.

110.    Defendants and their agents were aware of Plaintiff's serious health condition and of his need to take medical leave to receive treatment or because of pain rendering him unable to work.

111.    At no time prior to Plaintiff's request for leave on June 19, 2019, did Defendants provide Plaintiff with any information about his eligibility to take leave under the FMLA.

112.    When Defendant asserted his right to take leave to obtain care for his serious medical conditions, Defendant terminated Plaintiff less than nine (9) weeks later.

113.    The reasons given for his termination consisted of failing to be at work and performing his work duties even though Defendants knew Plaintiff had serious medical conditions for which he needed treatment.

114.    Plaintiff exercised Plaintiff's FMLA rights and Defendants interfered with Plaintiff's rights under the FMLA in violation of 29 U.S.C.A. §§ 2611, 2614(a)(1)(A) and 2615(a)(2).

115.    Defendants' actions were willful and done with malice.

116.    Plaintiff was injured due to Defendants' violations of the FMLA and is entitled to legal and injunctive relief.

**COUNT FIVE**
**VIOLATION OF THE FMLA (RETALIATION)**
**29 U.S.C. § 2601, *et. seq.***

117.    Plaintiff incorporates the allegations contained in ¶¶ 1–116 as though fully set forth in this paragraph.

118.    Plaintiff is an employee as defined under the FMLA.

16

119.     Defendants are employers as defined under the FMLA.

120.     Plaintiff was on leave due to a serious medical condition when Defendant terminated Plaintiff after less than nine weeks of leave.

121.     Defendants retaliated against Plaintiff for availing himself of his rights to medical leave under the FMLA when they terminated him. The reasons given for his termination consisted of failing to be at work and performing his work duties even though Defendants knew Plaintiff had serious medical conditions for which he needed treatment.

122.     Plaintiff exercised Plaintiff's FMLA rights and Defendants retaliated against him for exercising his rights under the FMLA in violation of 29 U.S.C.A. §§ 2611, 2614(a)(1)(A) and 2615(a)(2).

123.     Defendants' actions were willful and done with malice.

124.     Plaintiff was injured due to Defendants' violations of the FMLA and is entitled to legal and injunctive relief.

## COUNT SIX
## VIOLATION OF THE COBRA PROVISIONS OF ERISA
### 11 U.S.C. § 1161, *et. seq.*, and 29 U.S.C. §§ 1001–1461

125.     Plaintiff incorporates the allegations contained in ¶¶ 1–124 as though fully set forth in this paragraph.

126.     Defendants are employers as defined under ERISA.

127.     Plaintiff is a covered employee as defined by ERISA.

128.     Upon information and belief, Defendants CareFirst Bluechoice and CareFirst of Maryland are the plan administrators for the group health plan Plaintiff enrolled in during his employment with Defendants Starpower and Star Dance.

129.     Upon information and belief, Defendants CareFirst Bluechoice and CareFirst of

17

Maryland are plan administrators as defined by ERISA.

130.    Plaintiff was entitled to be offered COBRA continuation coverage, 42 U.S.C. § 300gg-91(4), for his health insurance at the time of his termination under 29 U.S.C. § 1161, the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461.

131.    Under the Consolidated Omnibus Budget Reconciliation Act, 11 U.S.C. § 1161 (COBRA), Defendants had an obligation to notify Plaintiff within thirty (30) days of his termination of benefits and of his right to elect to continue medical coverage at the group rate. Defendants never notified Plaintiff of his COBRA election rights.

132.    Upon information and belief, Defendants failed to offer or provide Plaintiff with notice of his right to coverage either at the time he was terminated or at the time Defendants terminated his health insurance. As of the date of this filing, Dillard still has not received notice of his right to continued health coverage.

133.    As a result of Defendants' failure described above, Plaintiff suffered damages which were caused by Defendants' failures.

<u>**COUNT SEVEN**</u>
**VIOLATION OF STATE LAW N.C. Gen. Stat. §§ 58-53-5 to 58-53-40**
**("MINI-COBRA")**

134.    Plaintiff incorporates the allegations contained in ¶¶ 1–133 as though fully set forth in this paragraph.

135.    Defendants' same actions that violated the federal laws requiring COBRA continuation coverage, 42 U.S.C. § 300gg-91(4), and 29 U.S.C. § 1161, the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1001–1461, also violated state law requirements under Article 53, Part One of Chapter 58 of the North Carolina General Statutes, "Group Health Insurance Continuation and Conversion Privileges."

18

136.   As a result of Defendants' actions, Plaintiff has suffered damages and is entitled to all relief available under state law.

## COUNT EIGHT
## BREACH OF FIDUCIARY DUTY BY GARY D. PATE

137.   Plaintiff incorporates the allegations contained in ¶¶ 1–136 as though fully set forth in this paragraph.

138.   Under ERISA 29 U.S.C. § 1001, *et. seq.,* as the majority stockholder, director, member, and officer of Defendants in charge of all business decisions with regard to health insurance, Pate owed Plaintiff a fiduciary duty to discharge the duties of his position in good faith and with diligence, care, loyalty and skill.

139.   Pate owed Plaintiff a duty of undivided and unqualified loyalty to not put his personal interest ahead of those of Defendants.

140.   Pate clearly breached his fiduciary duty to Plaintiff by putting his own interests ahead of the company and individuals to whom the company owed a fiduciary duty.

141.   Plaintiff believes and therefore asserts that Pate by his selfish actions deliberately withheld key information from Plaintiff to which Plaintiff was entitled about the ability to continue his health insurance and in doing so, materially caused Plaintiff financial damages and acute emotional distress while Plaintiff sought medical treatment for his serious medical conditions and disabilities.

142.   Plaintiff was injured by Defendants' breach of his fiduciary duty and is entitled to recover economic and compensatory damages from Pate.

## COUNT NINE
## BREACH OF FIDUCIARY DUTY AND/OR NEGLIGENCE
## BY MARK BARONDESS

143.   Plaintiff incorporates the allegations contained in ¶¶ 1–142 as though fully set forth

19

in this paragraph.

144.    As the lawyer and advisor for Pate, the majority stockholder, director, member, and officer of Defendants in charge of all business decisions with regard to health insurance, and Defendants, Barondess had a fiduciary duty to both Gary Pate and Defendants to ensure that Defendants were aware of their responsibilities under ERISA so that they could comply with their fiduciary duties and their statutory duties under ERISA to maintain and continue Plaintiff's health insurance.

145.    Barondess knew or should have known or willfully failed to discharge his fiduciary duty to both Pate and Defendants or his duty as a reasonable lawyer to discharge the duties of his position in good faith and with diligence, care, loyalty and skill and ensure that Plaintiff's health insurance was maintained and continued.

146.    Barondess's negligence and/or his breach of his fiduciary duty to Pate and Defendants caused Plaintiff financial damages and acute emotional distress resulting from his lack of insurance.

147.    Plaintiff is entitled to recover economic and compensatory damages from Barondess.

## COUNT TEN
## BREACH OF CONTRACT

148.    Plaintiff incorporates the allegations contained in ¶¶ 1–147 as though fully set forth in this paragraph.

149.    Plaintiff performed all requirements under the Employment Agreement between Defendants and Plaintiff.

150.    Defendants breached the Agreement when they failed to comply with their obligations under the contract to provide "health care and disability benefits."

20

151.    Defendants breached the Agreement when they failed to pay Plaintiff the compensation to which he was entitled under the Agreement.

152.    Defendants breached its Agreement when they failed to comply with the provisions of paragraphs 19-21 of the Agreement.

153.    As a direct and proximate result of the breaches of the Agreement by Defendants, Plaintiff has suffered monetary injuries and is entitled to damages.

## COUNT ELEVEN
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS BY DEFENDANT MARK BARONDESS

154.    Plaintiff incorporates the allegations contained in ¶¶ 1–153 as though fully set forth in this paragraph.

155.    Defendant Barondess knew of the Employment Agreement between Plaintiff and Defendants.

156.    As a lawyer, Defendant Barondess knew or should have known that Plaintiff could not be legally terminated for taking leave under the FMLA for his serious medical conditions or for asking for time off to accommodate his treatment for his disabilities.

157.    Defendant Barondess acted intentionally and with malice when he acted on behalf of the other Defendants to persuade them that Plaintiff was making too much money and should be terminated for alleged nonfeasance.

158.    Defendant Barondess exceeded the scope of his authority when he authored a letter terminating Plaintiff if he did not resign his employment.

159.    As a direct and proximate result of the wrongful actions by Defendant Barondess, Plaintiff's contract with Defendants was terminated and Plaintiff has suffered monetary injuries and is entitled to recover damages.

**WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY**
**UNDER STATE LAW**
**N.C. Gen. Stat. Chapter 95**

160.     Plaintiff incorporates the allegations contained in ¶¶ 1–159 as though fully set forth in this paragraph.

161.     Plaintiff was discharged in violation of the public policy of the State of North Carolina reflected in Chapter 168A of the North Carolina General Statutes entitled the "North Carolina Person with Disabilities Protection Act" in which the General Assembly declared that "the practice of discrimination based upon a disabling condition is contrary to the public interest and to the principles of freedom and equality of opportunity; the practice of discrimination on the basis of a disabling condition threatens the rights and proper privileges of the inhabitants of this State; and such discrimination results in a failure to realize the productive capacity of individuals to their fullest extent."

162.     Plaintiff was also discharged in violation of the public policy of North Carolina reflected in Article 2 and Article 21 of Chapter 95 of the North Carolina General Statutes wherein the General Assembly expressed the public policy inherent in paying employees overtime to which they are entitled and that the public policy interest in preventing retaliatory action against employees making good faith complaints about wage and hour violations.

163.     Plaintiff was also discharged in violation of the public policy of North Carolina reflected in the Chapter 98 of the North Carolina General Statutes (Worker's Compensation) where at the time he was terminated he was out of work due to medical conditions related to his workplace injury for which Defendants failed to carry any worker's compensation insurance in violation of the law and public policy of this State.

164.     As a result of his wrongful discharge by defendant in violation of the public policies

of this State, Plaintiff suffered the harms and damages alleged above in this complaint.

**COUNT THIRTEEN**
**EMPLOYER NEGLIGENCE IN LIEU OF WORKER'S COMPENSATION**

165.    Plaintiff incorporates the allegations contained in ¶¶ 1–164 as though fully set forth in this paragraph.

166.    Plaintiff was injured while working for Defendants who did not have workers' compensation insurance as required by law.

167.    Defendants had a legal duty to carry and provide workers' compensation to its employees, including Plaintiff.

168.    Workers' compensation claims are usually the exclusive remedy of an injured employee.

169.    The NC Industrial Commission has exclusive jurisdiction over workers' compensation claims.

170.    Defendants cannot escape their responsibility to Plaintiff, an injured employee, by securing liability insurance or failing to secure liability insurance.

171.    If Defendants had secured liability insurance for their own protection and for some reason that coverage failed, their obligation to Plaintiff would be unimpaired.

172.    Plaintiff repeatedly informed Defendants of his injuries suffered while working for Defendants and their responsibility to provide workers' compensation insurance for such injuries.

173.    Plaintiff was in fact out of work for reasons related to his workplace injuries at the time Defendants sent him a letter threatening to terminate him if he did not resign.

174.    Plaintiff may bring an action under N.C. Gen. Stat. § 97-95 to enforce an Order of the Industrial Commission in his favor and the law specifically allows the action to be brought prior to the award.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff respectfully prays that this Court:

1.      Declaring that the acts and practices complained of here are in violation of the Plaintiff's rights as secured by the Americans With Disabilities Act of 1990, as amended, and the Family and Medical Leave Act of 1993, Chapter 168A of the North Carolina General Statutes;

2.      Requiring the Defendants to reinstate the Plaintiff to a position of equal duties and responsibilities, with equal pay and benefits, as the Plaintiff would have received but for the discriminatory and retaliatory conduct, or in the alternative, for an award of front pay;

3.      Preliminarily and permanently enjoining the defendant and its owners, officers, management personnel, employees, agents, attorneys, successors and assigns and those acting in concert from any conduct violating Plaintiff's rights as secured by the Americans With Disabilities Act, the Family and Medical Leave Act, and Chapter 168A of the North Carolina General Statutes;

4.      Awarding the Plaintiff back pay, interest, liquidated damages, appropriate recovery for lost employment benefits, and other affirmative relief including attorney's fees as may be appropriate under the Americans With Disabilities Act, the Family and Medical Leave Act, and Chapter 168A of the N.C. General Statutes;

5.      Awarding the Plaintiff compensatory and punitive damages under the Americans With Disabilities Act and Chapter 168A of the North Carolina General Statutes;

6.      Awarding the Plaintiff liquidated damages under the FMLA;

7.      Awarding the Plaintiff compensatory damages for the wrongful discharge of his employment;

8.      Awarding Plaintiff damages and attorneys' fees under ERISA, COBRA and the

24

comparable North Carolina law regarding notice and provision of health insurance continuation coverage;

9. Enter an order enforcing any order of the North Carolina Industrial Commission against Defendants for workplace injuries suffered by Plaintiff;

10. Awarding the Plaintiff costs incurred in this action; and

11. Ordering any other relief this court deems to be just and equitable.

**JURY TRIAL DEMANDED**

Plaintiff request a jury trial on all questions of fact raised by the Complaint.

RESPECTFULLY SUBMITTED, this the 22nd day of September 2021.

/s/ Beth A. Stanfield
Beth A. Stanfield
N.C. State Bar No. 36296
Forrest Firm, P.C.
105 Grace Street, Suite 101
Wilmington, North Carolina 28401
beth.stanfield@forrestfirm.com
Telephone & Fax: (910) 408-3260